UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA

       -against-                                     No. 13-CR-587 (DLI)

MICHAEL ORTHODOX,

            *Defendant.*

-------------------------------------------------------------X

# MEMORANDUM IN AID OF SENTENCING
# ON BEHALF OF DEFENDANT MICHAEL ORTHODOX

                                                     Jane Fisher-Byrialsen
                                                     *Counsel of Record*
                                                     **Fisher, Byrialsen & Kreizer, PLLC**
                                                     291 Broadway, Suite 709
                                                     New York, New York 10007
                                                     T: 212-962-0848
                                                     F: 212-577-1178
                                                     *Attorneys for Michael Orthodox*

# Fisher, Byrialsen & Kreizer, P.L.L.C.

**Attorneys At Law**

David N. Fisher*
Jane H. Fisher-Byrialsen+
David P. Kreizer*
_____

Alissa M. Boshnack
Lara H. Weissman*
Kaitlin F. Nares*
_____

Judd B. Shaw^
Of Counsel

291 broadway, Suite 709
new york, New york 10007


Tel: (212) 962-0848
Fax: (212) 577-1178

_____

www.FBKLegal.com
_____

482 Notch Road
Woodland Park, NJ 07424
T: (973) 638-1530
F: (973) 638-1531


*Admitted in NY & NJ
+ Admitted in NY, MD & DC
^Admitted in NJ

**MEMORANDUM IN AID OF SENTENCING**
**ON BEHALF OF DEFENDANT MICHAEL ORTHODOX**

This letter is respectfully submitted on behalf of Michael Orthodox, defendant in the above-entitled action, in connection with his sentencing, which is scheduled on February 27, 2015 at 10:00 a.m.  For all the reasons set forth below, it is respectfully submitted that Mr. Orthodox should be sentenced to a term of 60 months imprisonment as recommended by the U.S. Probation Department, with lengthy mental health treatment, based on his history and characteristics, his mental health problems and his already lengthy incarceration at Metropolitan Detention Center this sentence would be appropriate.

As detailed below, the reasons justifying a sentence below the Sentencing Guideline range, independently or in combination, are as follows:

(a)  Michael's extremely difficult personal and family background;
(b)  Michael's mental health and drug treatment needs;
(c)  Michael's lengthy pre-trial confinement under harsh circumstances; and
(d)  Lengthy incarceration is not needed to achieve the goals of 18 U.S.C. §3553(a)(2).

I. **The Pre-Sentence Report, the Sentencing Guidelines, and the Principles Governing Federal Sentencing Since *United States v. Booker*, 534 U.S. 220 (2005)**

A. The Pre-Sentence Report

The Pre-Sentence Report (hereinafter "PSR") calculates an advisory guidelines range of 84 to 105 months, based on a total offense level of 23 and a criminal history category of V. However, the U.S. Probation Department Sentence Recommendation filed in this case recommends the Court sentence Michael to 60 months imprisonment, 3 years supervised release with stringent special conditions to address his mental illness and his drug addiction.

As detailed below, the Guidelines range as calculated in the PSR and the plea agreement prescribes a sentence in excess of that "sufficient but not greater than necessary" to achieve the purposes enumerated in §3553(a)(2). Michael should therefore be sentenced to 60 months in this case.

B.   Sentencing Pursuant to 18 U.S.C. §3553(a)(2) and Post *Booker* Case Law

The Supreme Court has held that the Sentencing Guidelines are "effectively advisory," *United States v. Booker*, 543 U.S. 220, 245 (2005), and has empowered district judges with "considerable discretion" in determining whether a non-guideline sentence is justified. *United States v. Jones*, 531 F.3d 163, 171 (2d Cir. June 24, 2008). Indeed, *Booker* instructs district courts to consider all of the statutory factors listed under 18 U.S.C. § 3553(a) in order to tailor an appropriate sentence based on the defendant's specific situation and particular circumstances.

The Second Circuit echoed this requirement, directing courts to "make an 'individualized assessment' of the sentence warranted by §3553(a) 'based on the facts presented.'" *Jones*, 531 F.3d 163, 182 (*quoting Gall v. United States*, 128 S.Ct. 586, 597 (2007)); *see also United States v. Koon*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate . . . the crime and the punishment to ensue").

Recently, in *Pepper v. United States,* 131 S.Ct. 1229, 131 (2011), the Court twice emphasized that a sentencing judge assumes "an overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)." *Id.* at 1242, 1243. *See also United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. 2010) ("[u]nder § 3553(a)'s 'parsimony clause,' it is the sentencing court's duty to 'impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth at 18 U.S.C. § 3553(a)(2)") *quoting United States v. Samas*, 561 F.3d 108, 110 (2d Cir. 2009).

As the Second Circuit explained in *Dorvee*,

> [e]ven where the district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the § 3553(a) sentencing factors. *See [United States v.] Cavera,* 550 F.3d [180], 189 [(2d Cir. 2008)].

604 F.3d at 93.

Similarly, in *Rita*, the Court noted the right and importance of all parties to be heard at sentencing as to the appropriate punishment: "In determining the merits of [the parties'] arguments, the sentencing court does not enjoy the benefit of a legal presumption that the

Guidelines sentence should apply." 127 S.Ct. at 2465 (*citing Booker*, 543 U.S. at 259-60). By extension, the Supreme Court has held that a non-guidelines sentence is not presumptively unreasonable. *See Gall*, 128 S.Ct. at 597; *See also Nelson v. United States*, 550 U.S. 350, 351 (2009), ("[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable").

Further, a sentencing court need not justify the imposition of a non-guidelines sentence with "extraordinary" circumstances. *See Jones*, 531 F.3d 163, 171 (*citing Gall*, 128 S.Ct. at 595). Indeed, it is well-established that there is no limit to the information which sentencing courts may consider. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person . . . which a court . . . may receive and consider for the purpose of imposing an appropriate sentence."); *see also Jones*, 531 F.3d 163, 172 n.6 ("It had been established long before the advent of the Guidelines that the sentencing court could properly take into account any information known to it.") (*quoting United States v. Concepcion*, 983 F.2d 369, 387 (2d Cir. 1992)).

Following *Booker, Rita*, *Gall* and *Kimbrough*, the Second Circuit has emphasized that it is "emphatically clear that the Guidelines are guidelines – that they are truly advisory." *United States v. Cavera*, 550 F.3d 180,189 (2d Cir. Dec. 4, 2008). *See also United States v. Adelson*, 301 Fed. Appx. 93, 95 (2d Cir. Dec. 9, 2008). It is clear from the Court's decision in *Cavera* that extraordinary circumstances are not necessary to justify a deviation from the guidelines and there is no "rigid mathematical formula" by which the justification can be measured. *Id*. Rather, district courts are instructed to employ their "informed and individualized judgment" to reach a sentence that is "sufficient but not greater than necessary to fulfill the purposes of sentencing." *Id*.

Thus, specific grounds for the imposition of a sentence below the advisory guidelines are not necessary or determinative, as these recent holdings make clear. If the totality of the defendant's individual characteristics and other considerations set forth in §3553(a) call for a sentence below the guidelines range the Court should impose such a sentence. In keeping with the Supreme Court's decisions in *Booker*, *Rita*, *Gall* and *Kimbrough*, and the Second Circuit's more recent decision in *Jones*, we respectfully urge this Court to consider Michael's individual characteristics as detailed below and sentence him to a sentence well below his advisory guideline range.

## II.    Analysis of the § 3553(a) Factors Compels a Sentence Substantially Below Michael's Applicable Sentencing Guidelines Range

As discussed below, in applying to Michael both §3553(a)'s mandate that a sentence be "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in" §3553(a)(2), and sentencing factors from §3553(a)(1)-(7), it is respectfully submitted that a sentence of 60 months is appropriate.[1]

---

[1] 18 U.S.C. § 3553(a) factors are:

    (1)    the nature of and circumstances of the offense and the history and characteristics of the defendant;
    (2)    the need for the sentence imposed –

In considering those prescribed sentencing factors and identified purposes of sentencing, several aspects of Michael's circumstances are relevant. Either independently or in combination, they amply justify a sentence of 60 months.

### A. Michael's History and Personal Characteristics Depict an Individual with a Troubled Youth

#### i. Parental Neglect and Dysfunctional Home Life

It has taken Michael a very long to come to terms with his horrific childhood and the abuse he underwent. As indicated in the PSR, Michael, in his prior interview with the U.S. Probation Department for his previous conviction, mentioned his older half-brother, Philip Reva, but refused to elaborate as to why there had been a falling out between the two of them. (PSR ¶ 33). It was not until well into counsel's representation of Michael in this case and following the birth of his daughter, Leelah, that Michael began to speak openly about his childhood and the sexual abuse he underwent. I mention the birth of his daughter as a point of reference, because it was a moment at which Michael completely changed as a client and a person. Michael opened up about his past, showed great remorse for what he had done and showed genuine interest in addressing his mental health and substance abuse problems so that he could come out of this situation as a good father for his child. This openness and willingness to address many of the underlying issues that contribute to his mental health and substance abuse problems, is demonstrated in his willingness to, this time, discuss with the U.S. Probation Officer, the sexual abuse he underwent at the hands of his half-brother and half-sister.[2]  (PSR ¶ 33).

Michael was "raised" mainly by his mother, Carol Ann Orthodox, as his father George Orthodox was gone for long periods of time trying to find work wherever he could. When his father did come home, no one was happy to see him, as he brought with anger and violence that was taken out on everyone in the family, including Michael. Michael's parents fought constantly over money. One of Michael's most vivid childhood memories is his mother setting his father's arm on fire during a physical fight between the two of them. George Orthodox was a heavy drinker and when he would get drunk, he would hit Michael when Michael would try to defend his mom.

---

|     |     |     |     |
| --- | --- | --- | --- |
|     | (A) |     | to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; |
|     | (B) |     | to afford adequate deterrence to criminal conduct; |
|     | (C) |     | to protect the public from further crimes of the defendant; and |
|     | (D) |     | to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; |
| (3) |     | the kinds of sentences available; | |
| (4) |     | the advisory Guidelines range; | |
| (5) |     | any pertinent policy statements issued by the Sentencing Commission; | |
| (6) |     | the need to avoid unwarranted sentence disparities; and | |
| (7) |     | the need to provide restitution to any victims of the offense. | |

[2] This will be discussed in more detail below.

However, it was not only George who would beat Michael, Carol Ann did her fair share of corporal punishment.  Michael remembers that although his mother did not care much what he was doing, who he was with, when he came home or how he did in school, she would explode at the most minor things.  An example that Michael recalls is spilling his water glass on the dinner table when he was about ten years old and his mother become so angry that she flipped the table over onto him.  Other times in fits of rage, Carol Ann would beat Michael with belts, hangers or the plastic rods from the window blinds.  Michael recalls that over the years more and more anger built up inside him as a result of all this abuse.  But he would never hit his mother back, instead he punched walls and doors and would hit his own head against the wall.

When Michael was about 12 years old his mother was diagnosed with cancer, cirrhosis, and diabetes and became very ill, so much so that she lost her job at the Perkins chain restaurant where she worked.  Over the years Carol Ann became worse and worse and suffered great pain.  She took a variety of medications and narcotics for her illnesses and pain.  The family was so poor at the time, with Michael's father being gone and his mother unable to work, that Michael would steal his mom's medication and sell it on the streets.  This is also when Michael's massive substance abuse problems started. When he would complain of headaches his mother would give him Vicodin or Xanax, which quickly led to Michael abusing those and other drugs.

      ii.  <u>Sexual and Mental Abuse by Siblings</u>

When Michael was about eight years old, his older half-brother, Philip, started to sexually molest him.  Philip would come into Michael's room and night and touch his genitals and make Michael do the same thing to him.  Similar sexual abuse was also perpetrated by his half-sister, Toniann, who would make Michael perform oral sex on her and bribe him with candy so that he would not tell their mother.  When Michael finally did tell his mother, she refused to believe him and instead beat him black and blue.  Michael always felt like an outcast in the family, being over ten years younger than his siblings.  Michael recalls that he never once felt any true love from his siblings and rarely from his mother.

Toniann not only sexually abused Michael she also mentally abused him by telling him that no one in the family wanted him to be born, that his mother should have aborted him and that in fact their mother tried to abort him by punching herself over and over in the stomach when she was pregnant with Michael.  Michael of course does not know if his mother did in fact do that, however, he still suffered under Toniann's constant verbal abuse.

When Michael was 10 years old Philip accused him of molesting Philip's 6 year old son.  As confirmed by Toniann, these accusations proved to be false.  (PSR ¶ 32).  This was just another way that Philip could abuse Michael.  Michael was arrested on these allegations and suffered great humiliation; this was the start of Michael's total downward spiral.  Michael began to act out more and more in school, he got in fights and he abused drugs on a daily basis.  Michael was caught with a knife in his bookbag and expelled from Tottenville High School.  This resulted in Michael being admitted to South Beach Psychiatric Center on Staten Island.

### iii. Mental Health Problems as a Child

On September 28, 2000, Michael was admitted to South Beach Psychiatric Center where he remained for inpatient treatment for approximately three weeks. At South Beach Psychiatric Center Michael was diagnosed with oppositional defiance and depression. After three weeks at the facility Michael was discharged to his mother and following his release from South Beach he received no further treatment as a child, though his problems persisted. In fact, Michael was examined by Dr. Sanford Drob, Ph.D., who found that Michael suffers symptoms of Post Traumatic Stress Disorder and bipolar mood disorder. Dr. Drob also found that Michael had severe substance abuse problems.

As part of Dr. Drob's evaluation, he reviewed the records from the South Beach Psychiatric Center and conducted independent testing. (See Exhibit A). As detailed in Dr. Drob's report, when Michael was 14 his intellectual functioning was in the low range and he exhibited high emotional reactivity and inadequate coping skills. (*Id*. at 13). Dr. Drob found that Michael presently exhibits symptoms of Complex Post-traumatic Stress Disorder ("PTSD") related to his early trauma, with repetitive familial and/or interpersonal maltreatment, which was especially exacerbated by parental neglect and disattunement. (*Id*. at 14). Dr. Drob concludes that Michael "is clearly in need of long-term residential treatment on a dual diagnosis or MICA unit for substance abuse disorders, and impaired socialization skills." (*Id*.)

### iv. Michael's Remorse and Positive View of the Future

This is not the first time this Court has had the opportunity to sentence Michael and must therefore inevitably be wondering why he deserves any leniency this time. The reason is simple. For the first time, the consequences of his actions weigh heavy on Michael for one very important reason: his one year old daughter, Leelah Ella Azemi, born while Michael was in custody in this case. (See Exhibit B). Michael cherishes his small daughter above all else in life. Leelah lives with her mother, Xhejlohn Azemi (English name Jamie), in Queens, New York. Michael and Jamie enjoy a very close and strong relationship that has endured Michael's almost 17 month incarceration in this case. Jamie brings Leelah to see Michael every week at MDC. In fact the first time Michael ever met his daughter was in the visiting room at MDC. A moment he says changed his entire life. Because of his daughter and the immense love and affection he feels for her, Michael is determined to address his mental health and substance abuse problems.

The things that Michael went through as a child broke him, but he is not incapable of repair. His daughter has given him the strength he needed to confront his problems and start to deal with them. This was clearly indicated in Dr. Drob's evaluation of Michael. In his analysis of Michael's present state Dr. Drob's findings indicate that Michael's remorse and shame regarding the instant offense is sincere and that he is clearly interested and willing to participate in treatment for his substance-abuse and psychological disorders. (Exhibit A, p. 14). Dr. Drob's findings are supported by Michael's actions he has taken on his own while detained at MDC,

including his efforts to seek the Court's assistance in enrolling in treatment during his pre-conviction detention.  (See Docket Entry 14 – Letter Submitted to Court by Michael Orthodox)[3].

Michael's growth is also demonstrated in his ability to develop functional and loving relationships with his daughter, Jamie (his girlfriend/daughter's mother) and her family.  For the first time in his life, Michael has been able to engage in reciprocal, caring relationships.  In the attached support letter from Jamie, she describes a man who was kind, considerate, helpful and caring while they lived together before he was arrested in this case.  (See Exhibit C).  She describes the mutual support that they have provided, and will continue to provide for each other.  (*Id*.)  This support, which has grown from their relationship and devotion to their family, is what has changed Michael and what he was lacking earlier in life.  Jamie's mother, who admittedly was not fond of Michael's background or upbringing, has also found that he has positively changed in response to the support he has found in Jamie and her family.  (See Exhibit D).  She describes in her letter how he has become a part of their family, and how she has seen that his daughter has created light at the end of a tunnel that was once dark.  (*Id*.)  Michael has finally found family to provide the love and support he so desperately needed to keep him on the right track.  Because he now has this support system, things are different for him and he will not again be steered towards his earlier indiscretions.

B.  <u>Lengthy Incarceration is not Needed for the Protection of Society in this Case</u>

Section 3553(a)(2)(C) instructs this Court to consider "the need for the sentence imposed" to "protect the public from further crimes of the defendant."  Michael participated in this crime as an act of disobedience due to misdirection, pain, and a troubled upbringing.  As such, Michael is not a threat to society, and with proper therapy and treatment he hopes to overcome his troubles.  He has readily accepted responsibility for his actions and is motivated to serve his time and emerge from prison as a productive member of society who is capable of supporting his daughter.

C.  <u>Educational/Vocational Training/Drug Treatment/Medical Needs</u>

Section 3553(a)(2)(D) requires this Court to consider the need to provide the defendant educational and/or vocational training, medical care, or other correctional treatment in the "most effective manner."   Thus, rehabilitation and the improvement of the defendant are express goals of sentencing.  *See Harmelin v. Michigan,* 501 U.S. 957, 999 (1991); and *United States v. Giraldo*, 822 F.2d 205, 210 (2d Cir.), *cert. denied*, 484 U.S. 969 (1987).  Rehabilitation is designed to instill "in the offender proper values and attitudes, by bolstering respect for himself and institutions, and by providing [] the means of leading a productive life."  *See* Charles E. Torcia, 1 *Wharton's Criminal Law,* § 18 (15th ed. 1993).

i.  <u>Education Needs</u>

Michael will certainly benefit from educational and vocational training while in custody.  That being said, incarceration beyond 60 months is certainly not necessary to achieve that goal.

---

[3] Counsel is unable to access this document on pacer and therefore unable to include it as an attachment to this submission.

Michael is motivated to find a job in construction upon his release, which he has been able to do in the past. Michael received his GED on March 2, 2006, while incarcerated on state charges. (PSR ¶ 48). Also while incarcerated Michael participated in several college courses through Marist College. (PSR ¶ 49). Again, although Michael could certainly benefit for additional vocational and educational training, and from his past performance while incarcerated is clearly motivated to do so, 60 months of incarceration is certainly sufficient to meet this goal.

> ii.     Medical Needs

Michael would certainly benefit from counseling and psychiatric treatment to address his serious mental health issues. While some of this type of treatment can be obtained while incarcerated, the degree to which he will be able to receive productive treatment is of course limited to the resources available at the jails.

It is a commonly accepted notion that people with substance abuse problems and mental health problems cannot get better until they are truly *themselves* motivated to do so. They can be forced by parents or courts into treatment and programs, but often fail because they are not themselves ready to acknowledge the depth of their problems and take the steps needed for recovery. Michael is ready. Therefore, we are not in a situation that would require more than 60 months of incarceration to ensure the rehabilitation goals of §3553(a)(2)(D) are met. In fact, the rehabilitation goals are much better met with stringent mental health treatment while on supervised release as facilities outside the Bureau of Prisons will be more suited to address Michael's needs as described in Dr. Drob's report to include long-term residential treatment on a dual diagnosis or MICA unit for substance abuse disorders, and impaired socialization skills.

> D. Michael has Endured Almost 17 Months of Pretrial Confinement Under Harsh Conditions at the MDC

Michael has spent nearly 17 months at MDC- Brooklyn, in pretrial confinement on this case. The harsh conditions at administrative facilities – including lack of ample programming, rodent infestations, limited family visits, poor bathroom conditions and lack of exposure to sunlight and the outside – are well known to the courts. Even prior to *Booker*, courts held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departure." *See United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001). *See also United States v. Farouil*, 124 F.3d 838, 847 (7th Cir. 1997); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996) (remanding for reasons for downward departure due to "harsher incarceration" due to unavailability of programs); *United States v. Brinton*, 139 F.3d 718, 725 (9th Cir. 1998); *United States v. Mateo*, 299 F.Supp.2d 201 (S.D.N.Y. 2004); *United States v. Francis*, 129 F. Supp.2d 612, 616 (S.D.N.Y. 2001).

Here, confinement at MDC has limited Michael's ability to receive educational and vocational training and been devoid of potential for rehabilitation. Accordingly, it is respectfully submitted that an adjustment below the advisory guidelines range is appropriate to account for Michael's custody at the MDC.

### III. Concurrent Time with Mr. Orthodox's Violation of Post Release Supervision

As the Court is aware, in addition to pleading guilty in this case Michael also pleaded guilty to the violation of his post release supervision in docket 08CR409.  Michael completely accepts responsibility for his disrespectful actions while on post release supervision and for his violation of that post release supervision.  Michael understands the importance of the supervision and his dire need for it.  He recognizes that his violation of the post release supervision is a breach of trust between himself and the Court.  Michael often recounts to counsel the stern guidance Your Honor gave him at his sentencing in docket 08CR409 and it is with great shame that he faces you for sentencing again.

The United States Probation Department is recommending that Michael receive a maximum term of two years imprisonment as punishment for his violation of post release supervision.  Michael is not in disagreement with this recommendation, however, he humbly requests, for all the same reasons outlined above, that the Court run that sentence concurrent to the sentence in this case.

### IV. Conclusion

Accordingly, for all the reasons set forth above, it is respectfully submitted that Michael Orthodox should be sentenced to a term of imprisonment of 60 months, with three years supervised release to include the conditions outline in the U.S. Probation Department Sentence Recommendation, a mandatory special assessment of $100, with his imprisonment time in this case to run concurrent to any sentence on his Violation of Post Release Supervision in docket 08CR409.

Dated:     New York, New York
           February 12, 2015

                                        Respectfully submitted,

                                        /s/

                                        Jane Fisher-Byrialsen
                                        *Counsel of Record*
                                        Fisher, Byrialsen & Kreizer, PLLC
                                        291 Broadway, Suite 709
                                        New York, New York 10007
                                        T: 212-962-0848
                                        F: 212-577-1178

cc: AUSA Rena Paul (via ECF)
    Michael Orthodox (via First Class Mail)
    U.S. Probation Officer Victoria M. Augilar (via E-Mail)